**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

WELLS DAIRY, INC.,

        Plaintiff,

vs.

FOOD MOVERS INTERNATIONAL,
INC.,

        Defendant.

No. C08-4019-MWB

**MEMORANDUM OPINION &**
**ORDER REGARDING**
**DEFENDANT'S MOTION TO**
**DISMISS FOR LACK OF PERSONAL**
**JURISDICTION**

———————————

**TABLE OF CONTENTS**

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.  PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.  FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*IV.  LEGAL STANDARDS AND ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.  Legal Standards For Rule 12(b)(2) And Personal Jurisdiction* . . . . . . . 5
    *B.  Personal Jurisdiction Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        *1.  Minimum contacts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        *2.  Fair play and substantial justice* . . . . . . . . . . . . . . . . . . . . 20

*V.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# I.  INTRODUCTION

Plaintiff Wells Dairy, Inc., has sued defendant Food Movers International, Inc. (FMI), for breach of contract.  In the motion currently before the court, Dkt. # 4, FMI argues the suit should be dismissed for lack of personal jurisdiction.

# II.  PROCEDURAL BACKGROUND

In late 2007, Wells Dairy filed a petition against FMI in Plymouth County District Court in Iowa.  Dkt. # 2.  Wells Dairy's petition alleges a breach of contract claim against FMI because FMI allegedly failed to pay Wells Dairy for certain dairy products Wells Dairy sold to FMI.  Wells Dairy specifically alleges that on or about July 3, 2007, and until approximately July 13, 2007, FMI sent purchase orders to Wells Dairy to buy dairy and frozen novelty products, that FMI received the products, and that FMI failed to pay Wells Dairy for the products.

FMI responded by filing notice of removal to this court on February 27, 2008, on the basis of diversity jurisdiction.  Dkt. # 1.  Then on March 5, 2008, FMI filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Dkt. # 4.  Wells Dairy filed its resistance on March 21, 2008.  Dkt. # 8.  Neither party requested oral argument, and FMI did not file a reply.  *See* N.D. IA. L.R. 7(g) (allowing the moving party to file reply briefs under certain circumstances).  The matter is now fully submitted.

## III.  FACTUAL BACKGROUND[1]

Wells Dairy is a corporation organized under the laws of Iowa.  Wells Dairy is in the business of manufacturing, distributing, and selling, among other things, dairy and frozen novelty products.  Its principal place of business is in Le Mars, Iowa, the "Ice Cream Capital of the World."[2]  Wells Dairy distributes its products nationwide, and has many other offices, including one in Alta Loma, California.

FMI is a food distributor, and a corporation organized under the laws of California.  FMI's principal and sole place of business is in Benecia, California.  As its name suggests, however, FMI distributes food to a community much larger than California.  To do so, FMI purchases bulk food products from manufacturers like Wells Dairy, and then resells the products to FMI's "retail and other distributor customers for a profit."  [LaMonica Aff. ¶ 5].

In May of 2005, FMI contacted Susanne Erickson to purchase dairy products from Wells Dairy.  Erickson works in Wells Dairy's Alta Loma office as the company's Western Regional Sales Manager.  FMI represented to Erickson that FMI is a national and international distributor of food products and that it wished to purchase Wells Dairy's products on credit and distribute the product "from the [FMI] distribution centers in Oakland, California; Dallas, Texas; Minneapolis, Minnesota; Washington, D.C.; Atlanta, Georgia; and Columbus, Ohio."  [Erickson Aff. ¶ 5].  Erickson informed FMI that it

---

[1] Because FMI moves to dismiss this action for lack of personal jurisdiction, the court must "view the evidence in the light most favorable to [Wells Dairy] and resolve factual conflicts in its favor."  *Romak USA, Inc. v. Rich*, 384 F.3d 979, 983-84 (8th Cir. 2004).

[2] *See* http://www.lemarsiowa.com/visitors_guide/visitor_center.cfm (last visited June 30, 2008).

would first have to be approved to purchase Wells Dairy's product on credit, and that this decision was made by the Credit and Receivables Department in Le Mars.

In late May of 2005, FMI applied for credit approval. Thomas Lamonica, as Vice-President of FMI, provided the necessary information to Erickson to support credit approval. Erickson provided this information to Wells Dairy's offices in Le Mars. Dave Bruggeman, the Director of Credit and Receivables for Wells Dairy, received FMI's credit application. Bruggeman reviewed FMI's credit application, verified the references listed on the application, and researched FMI, all from his office in Le Mars. Ultimately, Wells Dairy approved FMI's application to purchase Wells Dairy's products on credit.

FMI's authorization to purchase Wells Dairy's product on credit included non-standard shipping terms. Consistent with its standard operating procedure, Wells Dairy initially offered to deliver its product to FMI's place of business in California, and include such delivery costs as part of the purchase order price. FMI refused, however, and insisted that Wells Dairy's product be for "customer pick up" in Le Mars. [Erickson Aff. ¶ 10]. FMI specifically "requested this arrangment because it sought a $75.00 per pallett pick-up allowance for bringing in its own trucks and picking up the product." [Erickson Aff. ¶ 10].

After receiving credit authorization, and from June 25, 2005, until July 30, 2007, FMI faxed over one hundred purchase orders to Wells Dairy in Le Mars to purchase over six million dollars of Wells Dairy product. Deb Gran, Food Service Sales Account Coordinator for Wells Dairy, was responsible for entering, handling, processing, and providing customer support for FMI's purchase orders. FMI received $6,470,035.06 worth of product from Wells Dairy during this time period. FMI was invoiced for these purchases from Wells Dairy's offices in Le Mars, and FMI made regular payments to

Wells Dairy during this time by mailing a check drawn on FMI's California bank account to Wells Dairy in Le Mars.

The current lawsuit involves eleven allegedly fulfilled yet unpaid purchase orders faxed by FMI to Wells Dairy during the first two weeks in July of 2007. The eleven purchase orders requested product worth almost a half a million dollars. Each purchase order included a "HOW SHIP" field, along with other fields to denote who the purchase order was for, when it was requested, etc. The "HOW SHIP" field was always filled in with "Customer Picku[p]." [Gran Aff., ex. A]. In addition, the purchase orders indicated Wells Dairy was to ship the requested product to "Food Movers International, BLUE BUNNY 800-942-3800 x223, #1 BLUE BUNNY DR., LE MARS, IA 51031." [Gran Aff., ex. A]. FMI never told Erickson or Gran that anyone other than FMI would be picking up Wells Dairy's product in Le Mars. Gran always believed that the trucks picking up Wells Dairy's products for FMI were working for FMI.

## IV. LEGAL STANDARDS AND ANALYSIS

### A. Legal Standards For Rule 12(b)(2) And Personal Jurisdiction

Wells Dairy's complaint "must state sufficient facts . . . to support a reasonable inference that [FMI] may be subjected to jurisdiction in the forum state." *Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir. 2008). "'Once jurisdiction ha[s] been controverted or denied, [the plaintiff] ha[s] the burden of proving such facts.'" *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (quoting *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)). Wells Dairy need not, however, establish jurisdiction by a preponderance of the evidence until an evidentiary hearing is held, or until trial. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991). For Wells Dairy to survive FMI's motion to dismiss under Rule 12(b)(2) for lack

of personal jurisdiction, Wells Dairy "'need only make a prima facie showing of jurisdiction,' and may do so by affidavits, exhibits, or other evidence." *Romak USA, Inc. v. Rich*, 384 F.3d 979, 983 (8th Cir. 2004) (quoting *Epps v. Stewart Info. Serv. Corp*, 327 F.3d 642, 647 (8th Cir. 2003)). When examining Wells Dairy's prima facie showing, the court "must view the evidence in the light most favorable to [Wells Dairy] and resolve factual conflicts in its favor." *Id.* at 983-84.

This court "may assume jurisdiction over a foreign defendant only to the extent permitted by the forum state's long-arm statute and by the Due Process Clause of the Constitution." *Dakota Indus., Inc. v. Ever Best Ltd.*, 28 F.3d 910, 915 (8th Cir. 1994). Iowa's long-arm statute[3] "expands Iowa's jurisdictional reach to the widest due process parameters allowed by the United States Constitution." *Hammond v. Fl. Asset Fin. Corp.*, 695 N.W.2d 1, 5 (Iowa 2005) (discussing Iowa Rule of Civil Procedure 1.306). "As a result, the Court is left with the sole issue of whether exercising personal jurisdiction over [the] nonresident Defendant is consistent with principles of due process." *Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 499-500 (S.D. Iowa 2007); *see Bell Paper Box, Inc. v. U.S. Kids, Inc. (Bell Paper I)*, 22 F.3d 816, 818 (8th Cir. 1994) ("[W]hen a state

---

[3] Iowa's long-arm statute is actually set forth in two places: Iowa Code § 617.3 and Iowa Rule of Civil Procedure 1.306. Section 617.3 provides for the service of "foreign corporations or nonresidents contracting or committing torts in Iowa," Iowa Code § 617.3 (2006), and Rule 1.306 provides for an "[a]lternative method of service" that applies to "every corporation, individual, personal representative, partnership or association," Iowa R. Civ. P. 1.306. Rule 1.306 is the provision that specifically extends Iowa's jurisdictional reach to the federal constitutional limits. *See Hammond*, 695 N.W.2d at 5; *Larsen v. Scholl*, 296 N.W.2d 785, 788 (Iowa 1980) (noting that Iowa Rule of Civil Procedure 56.2 (now Rule 1.306), "unlike Iowa's older 'long-arm' statute, section 617.3, . . . expands Iowa's jurisdictional reach to the widest due process parameters of the federal constitution").

construes its long-arm statute to confer jurisdiction to the fullest extent permitted by the due process clause . . . the inquiry collapses into the single question of whether exercise of personal jurisdiction comports with due process.").

"The Due Process Clause requires 'minimum contacts' between the nonresident defendant and the forum state before the court may exercise jurisdiction over the defendant." *Coen v. Coen*, 509 F.3d 900, 905 (8th Cir. 2007) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)). The Eighth Circuit Court of Appeals has explained sufficient minimum contacts as follows:

> "Sufficient contacts exist when the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there, and when maintenance of the suit does not offend traditional notions of fair play and substantial justice." By defendant's reasonable anticipation, we mean "there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." We have set "a five-part test for measuring minimum contacts: (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (3) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." Factors one through three are primary. With respect to the third factor, we distinguish between specific jurisdiction and general jurisdiction. "'Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state,' while '[g]eneral jurisdiction . . . refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.'"

*Id.* (citations omitted); *see Steinbuch*, 518 F.3d at 585-86 (explaining the constitutional requirements for specific and general jurisdiction). "'Minimum contacts must exist either

at the time the cause of action arose, the time the suit was filed, or within a reasonable period of time immediately prior to the filing of the lawsuit.'" *Johnson v. Woodcock*, 444 F.3d 953, 955-56 (8th Cir. 2006) (quoting *Pecoraro v. Sky Ranch For Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003)).

If the court determines that a defendant has the requisite "minimum contacts within the forum state, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)); *see Luv N. Care Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 473 (5th Cir. 2006) ("It remains for us to inquire whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. When a plaintiff makes its *prima facie* case that the defendant has 'minimum contacts' with the forum state, the burden of proof shifts to the defendant to show that the exercise of jurisdiction would be unreasonable." (citation and quotation omitted)). These other factors include:

> "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of the controversies," and the "shared interest of the several States in furthering fundamental substantial social policies."

*Burger King Corp.*, 471 U.S. at 476-77 (quoting *World Wide Volkswagen*, 444 U.S. at 292). "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.* at 477. If, however, a defendant "seeks to defeat jurisdiction" when the defendant purposefully "directed his activities at forum residents"—i.e., when minimum

contacts are clearly established—the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.*

### B. Personal Jurisdiction Analysis

Wells Dairy argues the court has both specific and general jurisdiction over FMI. As a result, the court will analyze all five factors in its minimum contact analysis. *See Lakin v. Prudential Securities, Inc.*, 348 F.3d 704, 712 (8th Cir. 2003) (noting that the "source and connection" factor is not relevant in a general jurisdictional analysis, and that the "quantity of the contacts" factor is not especially relevant in a specific jurisdictional analysis).

### 1. Minimum contacts

FMI's contacts in Iowa are the result of its three-year buyer/seller business relationship with Wells Dairy. Although FMI initiated the relationship and sought credit approval from Wells Dairy, all of this was done by the parties from their respective states. In fact, FMI usually communicated, at least during the initial credit authorization process, with Wells Dairy by speaking to Erickson in Wells Dairy's California office. FMI did, however, occasionally speak over the phone with Gran in Le Mars whenever customer service issues arose, or when FMI needed to cancel an order. FMI also faxed over one hundred purchase orders totaling over six million dollars to Wells Dairy in Le Mars, and mailed checks to Wells Dairy from FMI's bank in California to pay for the product it ordered. These contacts reveal that the *quantity* of "communicative" contacts *between the parties* is fairly extensive, and not just over their whole multi-year business relationship, but also with regard to the instant suit. FMI faxed over eleven purchase orders to Wells Dairy in Iowa during the two week period in July that forms the basis for this suit. Thus, the *relation* of this cause of action to the "communicative" contacts, specifically the eleven

purchase orders faxed to Wells Dairy in Iowa, is quite significant, too. Furthermore, because Wells Dairy is primarily located in Iowa, the communication between the parties connects FMI to Iowa even though FMI's communications came from California.

But as FMI points out, it is a California corporation with no offices or employees in Iowa. FMI does not maintain bank accounts in Iowa and has no phone listings in Iowa. FMI also has never attended any business meetings in Iowa or disseminated any business materials in Iowa. These facts all suggest that the *nature and quality*, at least regarding FMI's "physical" contacts with the forum state, is poor. In fact, they suggest that FMI's physical contact with Iowa is nonexistent.

Thus, it appears the nature and quality of FMI's overall contacts with Iowa is also poor, because it seems limited to the noted "communicative" contacts with Wells Dairy in Iowa. In fact, the Eighth Circuit Court of Appeals has stated, "The use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot provide the 'minimum contacts' required by due process." *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982); *see Bell Paper Box, Inc. v. Trans W. Polymers, Inc.* (*Bell Paper II*), 53 F.3d 920, 923 (8th Cir. 1995) (noting the defendant "has only ancillary contacts with [the forum state]"). FMI relies heavily on this language in *Scullin Steel*, as well as the factual similarities between *Scullin Steel* and the present case, to support its argument that the court lacks personal jurisdiction over it.

In *Scullin Steel*, the court held that a nonresident buyer could not be haled into court in Missouri. 676 F.2d at 314. Plaintiff, a manufacturer of steel castings in Missouri, sold

its castings to the nonresident defendant "F.O.B. Seller's Plant, St. Louis, Missouri."[4] *Id.* at 310. The castings were then shipped from St. Louis to the nonresident defendant, where the defendant used the castings to manufacture railroad cars. *Id.* The court noted that "[t]he critical relationship is that 'among the defendant, the forum, and the litigation,'" *Id.* at 313 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)), and that the plaintiff "in essence relies upon its performance under the contract within the forum to supply the requisite minimum contacts." *Id.*

There is no doubt the present case and *Scullin Steel* share similarities. Like the nonresident defendant in *Scullin Steel*, FMI does not have any physical contact with the forum state. *See id.* at 312 (noting defendant "has no office or personnel in Missouri, owns no real property in Missouri, and does not have any agent for service of process or for any other purpose in Missouri"). The most evident contacts with the forum state in both cases are "communicative" contacts, whereby the defendants used "interstate facilities" such as the telephone, mail, and fax to communicate with the resident plaintiffs. *See id.* ("[Defendant] sent its payments to St. Louis; the parties also used the mail and exchanged telephone calls.").

Wells Dairy argues, however, that *Scullin Steel* should not be given great weight because the opinion does not recognize, as later cases do, that *in personam* jurisdiction does not require the defendant's physical presence in the forum state. *See Burger King*

---

[4] "F.O.B." means "Free On Board," *Unlaub Co., Inc. v. Sexton*, 568 F.2d 72, 77 n.4 (8th Cir. 1977) (explaining the F.O.B. as a delivery term under the Uniform Commercial Code); *see* Iowa Code § 554.2319 (2006) (defining F.O.B.), and "F.O.B. Seller's Plant" denotes that the seller was delivering the product to the buyer "free on board" at seller's plant, *see Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 525 (8th Cir. 1996) (explaining "F.O.B. Singapore"); *Bell Paper I*, 22 F.3d at 819 (explaining "F.O.B. Sioux Falls, South Dakota").

*Corp.*, 471 U.S. at 476 (noting three years after *Scullin Steel* was decided, "Jurisdiction in these circumstances ("where the defendant 'deliberately' has engaged in significant activities within a State") may not be avoided merely because the defendant did not *physically* enter the forum State."). Wells Dairy also argues that, unlike the case in *Scullin Steel* where most of the contacts between plaintiff and defendant occurred outside of the forum state, most of the contacts between Wells Dairy and FMI occurred in the forum state. Thirdly, Wells Dairy differentiates *Scullin Steel* because the only requirement in that case was the delivery—not the manufacture—of the product in the forum state, whereas FMI required the manufacture of the product in Iowa. Fourth, and finally, Wells Dairy differentiates *Scullin Steel* because in this case, and unlike in *Scullin Steel*, there is a disputed issue of fact over FMI's physical presence in Iowa.

The court agrees with Wells Dairy that *Scullin Steel* is distinguishable from the present case, although not exactly for all the reasons Wells Dairy articulates. It is true that *Scullin Steel* was decided prior to *Burger King*'s recognition that physical presence is not a prerequisite to personal jurisdiction. But the court thinks the present case is similar to *Scullin Steel* in respect to where the obvious contacts between the plaintiffs and defendants took place. In both cases, the main contacts between the parties took place through "interstate facilities" (telephone, mail, fax) with plaintiffs in the forum state and defendants somewhere else, and if face to face communication occurred, it always occurred outside the forum state.

The court also generally disagrees with Wells Dairy's third and fourth points noted above. In *Scullin Steel*, the parties used the delivery term "F.O.B. Seller's Place," whereas in the present case the parties used the term "customer pick-up." Both terms require the delivery of the seller's product at the specified location in the forum state, but in neither case do the terms require the manufacture of the product in the forum state. *See*

*Scullin Steel*, 676 F.2d at 313 n.5 ("Scullin Steel was not required by the sales agreement to manufacture the car sets and parts in [the forum state]."). Thus, the court disagrees with Wells Dairy's argument that FMI required Wells Dairy to manufacture the product in Le Mars. Of course, the court recognizes that, in this case, as well as in *Scullin Steel*, it was entirely foreseeable that the manufacture of the product would occur in the forum state. In *Scullin Steel*, the plaintiff's only plant was in the forum state, which the defendant understood. In the present case, FMI also understood that Wells Dairy would be manufacturing its product in Le Mars. It is inconceivable that the nonresident defendants in either case could have thought the manufacture of the product was occurring somewhere other than the forum state. The fact that the nonresident defendants knew plaintiffs would be manufacturing the product in the forum state, however, is not *alone* enough to confer personal jurisdiction. *See Scullin Steel*, 676 F.2d at 313 n.5 ("However, '"foreseeability" (of an impact within the forum state) alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.'" (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 295)).

Lastly, the court disagrees with Wells Dairy's argument that the present case is distinguishable from *Scullin Steel* because FMI's physical presence in Iowa is disputed. Certainly, the court is aware that Wells Dairy argues there is a disputed issue of fact in this regard. *See, e.g.*, Dkt. # 8, p. 16 (noting that FMI's "lack of physical presence [is] a disputed fact"). But that is merely argument: the affidavits and exhibits only establish that Wells Dairy believed FMI was picking up its product in Iowa—they do not establish that FMI was actually in Iowa. Gran states, "At no time did [FMI] ever tell me anyone other than [FMI] would be picking up the product in Le Mars," and that "I always believed that the trucks picking up product from [Wells Dairy] for [FMI] were working for [FMI]." [Gran Aff. ¶¶ 12-13]. Erickson similarly states, "[FMI] never informed me that anyone

other than [FMI] would be accepting [Wells Dairy] product in Le Mars, Iowa." [Erickson Aff. ¶ 12]. Erickson also states that FMI explained it wanted "customer pick-up" terms "because it sought a $75.00 per pallet pick-up allowance for bringing in its own trucks and picking up the product." [Erickson Aff. ¶ 10]. Finally, the purchase orders indicate that FMI's orders were for "customer pick-up" and that Wells Dairy was to ship the product to "Food Movers International, BLUE BUNNY 800-942-3800 x223, #1 BLUE BUNNY DR., LEMARS, IA 51031."

The affidavits of Gran and Erickson definitely indicate that Wells Dairy believed FMI was physically picking up the product in Iowa. Moreover, the purchase orders—faxed by FMI—reveal that Wells Dairy had good reason to believe that FMI was picking up the product. After all, FMI was Wells Dairy's customer, and the products were shipped to FMI for "customer pick-up."[5] However, the court does not believe the affidavits and purchase orders establish that FMI actually physically picked up the product. While the court must resolve all factual disputes in Wells Dairy's favor at this stage, *see Romak USA, Inc.*, 384 F.3d at 983-84, the court believes Anthony LaMonica's statements in his sworn affidavit more specifically address the issue of FMI's physical presence in Iowa concerning the pick up of the purchased product. FMI President LaMonica states, "FMI's customers that had purchased the Wells products would send their own trucks to take delivery of the products in Le Mars, Iowa," and that "FMI never took delivery of, received, or otherwise accepted or possessed the Wells products." [LaMonica Aff. ¶¶ 16-17]. In other words, the court believes Wells Dairy's affidavits and exhibits do not directly dispute LaMonica's statements, but instead relate only to Wells Dairy's entirely

---

[5] FMI obviously interprets the "customer" in the phrase "customer pick up" as FMI's customer, and not Wells Dairy's customer.

reasonable belief that FMI was picking up the product in Le Mars. Thus, there is no factual dispute that the court must resolve in Wells Dairy's favor, or need for an evidentiary hearing on the issue of FMI's physical presence in Iowa.

Yet, the court does resolve the legal battle over the applicability of *Scullin Steel* to the present case in Wells Dairy's favor. The court agrees with Wells Dairy that *Scullin Steel*, while sharing factual similarities with the present case, is not ultimately controlling. *Scullin Steel* is not controlling for two reasons: (1) FMI initiated contact in this case, and (2) FMI received and transferred possession of the purchased product in the forum state.

Regarding the court's first reason, the Eighth Circuit Court of Appeals has recognized that the "[a]ctions by [the nonresident defendant] *itself* must have created a 'substantial connection' with the forum." *Bell Paper II*, 53 F.3d at 922 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Thus, the Eighth Circuit Court of Appeals has emphasized the principle that the nonresident defendant "must have purposefully availed itself of 'the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hansen v. Denckla*, 357 U.S. 235, 253 (1958)). This principle insures that the nonresident defendant's "contacts with [the forum state] must be more than 'random,' 'fortuitous,' or 'attenuated.'" *Id.* (quoting *Burger King*, 471 U.S. at 475). There is no dispute or doubt in this case that FMI sought out Wells Dairy as a business partner. FMI came to Wells Dairy, albeit in California, and did so knowing that Wells Dairy's major operations—from credit authorization, customer support, manufacturing, and billing—all occurred in Le Mars, Iowa. There is absolutely nothing random or fortuitous about FMI purposefully availing itself of the opportunity to conduct activities with Wells Dairy in Iowa.

Of course, the contacts must also be significant. That is why the court's second reason for distinguishing *Scullin Steel* from the present case is important. At this point,

15

the court has only recognized the largely "communicative" contacts between the parties from their respective home bases. The court has also recognized that FMI never physically picked-up the product in Le Mars, and does not really have any obvious "physical" contacts in Iowa. Nevertheless, FMI does have "legal" contacts in Iowa because FMI effectively received and sold Wells Dairy's product in Iowa. *See Exec. Airlines, Inc. v. Van Benthuysen*, 135 F. Supp. 2d 146, 149 (D.P.R. 2001) (noting the defendant benefitted from "legal contacts with Puerto Rico"). As Wells Dairy argues, "If [FMI] did resell [Wells Dairy's] product, [FMI] would be now a seller of [Wells Dairy's] product in Iowa, as arguably it received delivery of product in Iowa and simultaneously transferred possession of that product to its customers in Iowa." Dkt. # 8.

To understand FMI's legal contacts in Iowa, it is necessary to understand the similarities between the parties' delivery terms in the present case and *Scullin Steel*, and also the huge difference between the nonresident buyers' actions in both cases after they received delivery of the product. FMI's bargained for delivery term, "customer pick-up," is largely identical to the delivery term used in *Scullin Steel*—"F.O.B. Seller's Plant." While FMI and Wells Dairy may dispute who the "customer" is in the phrase "customer pick-up," the phrase undoubtedly means, just as "F.O.B. Seller's Plant" means, that the seller must deliver the product to the seller's own place. Essentially, neither term requires delivery at all. The place of delivery is the same as the place of manufacture, and in both cases, that place is the forum state.

The Eighth Circuit Court of Appeals did not agree with plaintiff's argument in *Scullin Steel* that the parties' delivery terms gave the district court personal jurisdiction over the nonresident defendant. *See Scullin Steel*, 676 F.2d at 313 ("To support the exercise of personal jurisdiction over [the nonresident defendant], [plaintiff] cites its manufacture of the castings within Missouri, delivery "F.O.B. St. Louis," and payment

within Missouri."). The court can similarly agree here that the parties' delivery term requiring delivery to the forum state does not, by itself, confer personal jurisdiction over FMI as a result of any legal rights FMI obtains from the operation of the delivery terms.[6] The court does not believe the ultimate outcome in this case is the same as in *Scullin Steel*, however, for one primary reason: In this case, FMI received *and transferred possession* of the product in the forum state.

In *Scullin Steel*, the seller simply delivered the steel castings to "Seller's Plant," and then the castings were shipped out of the forum state to the buyer. *See Scullin Steel*, 676 F.2d at 310 ("[A]ll shipments were made from St. Louis."). The buyer never did anything with the steel castings in the forum state. In this case, however, FMI effectively sold the product to FMI's customers in Iowa. Thus, not only did FMI receive legal title to the product in Iowa when Wells Dairy delivered the product, but FMI transferred legal title

---

[6] The Eighth Circuit Court of Appeals, in a personal jurisdiction opinion decided a week before *Scullin Steel*, specifically pointed out that delivery terms might have an effect on a personal jurisdiction analysis. *See Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 656 n.5 (8th Cir. 1982) ("The goods in the present case were not to be delivered within the forum state; the shipments were marked 'F.O.B. New Orleans.'"). Although in the same footnote, the Eighth Circuit Court of Appeals also suggested by citation and parenthetical that delivery terms were of "question[able] significance for purposes of personal jurisdiction" analysis. *Id.* (citing *Lakeside Bridge & Steel Co. v. Mountain State Const. Co.*, 597 F.2d 596, 603-04 & n.14 (7th Cir. 1979)); *see also Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 471-72 (5th Cir. 2006) (concluding "a F.O.B. term" is a factor the court can consider in certain circumstances, but also noting "[j]urisdiction . . . 'does not depend on the technicalities of when title passes'" (quoting *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n.8 (5th Cir. 1980))). The Eighth Circuit Court of Appeals then cleared things up over a decade later in recognizing that "[s]tanding alone," a "delivery term in a contract [can] not create sufficient contacts to uphold jurisdiction," but that "[s]uch delivery terms are not irrelevant to a finding of personal jurisdiction." *Bell Paper I*, 22 F.3d at 820 n.2.

to FMI's customers in Iowa as well. FMI admits that it is a distributor of food products, and that FMI's customers were the ones picking up the product from Wells Dairy's loading docks in Le Mars. Even if FMI was not physically present in Le Mars to "middle" the product to its customers, FMI was legally present as the owner and seller of the product when Wells Dairy delivered the product to Wells Dairy's loading docks. The fact that Wells Dairy shipped the product to to "Food Movers International, BLUE BUNNY 800-942-3800 x223, #1 BLUE BUNNY DR., LE MARS, IA 51031," and the fact that FMI called Wells Dairy in Le Mars whenever customer service issues arose about picking up the product, highlight FMI's "legal" contact with and authority over the product in Iowa.[7]

Thus, the court does not agree with FMI that *Scullin Steel* controls the outcome in this case. This case is decidedly not like *Scullin Steel* because FMI initiated contact with Wells Dairy and because FMI received and transferred possession of the product in the forum state. This latter difference signals the similarity of this case with *Bell Paper I*, an Eighth Circuit decision holding personal jurisdiction existed over a nonresident defendant. 22 F.3d 816. In *Bell Paper I*, the plaintiff printed and sold folding cartons to the nonresident defendant. *Id*. at 818. The nonresident defendant dealt with a third party to provide the "camera-ready films" to the plaintiff. *Id*. These films were used by the plaintiff to print the design on the folding cartons. *Id*. Although the nonresident defendant

---

[7] Iowa statutory law and the Uniform Commercial Code also support FMI's legal authority over the product in the forum state. Section 554.2401 of the Iowa Code generally instructs that FMI received title to the product when "the seller completes the seller's performance with reference to the physical delivery of the goods." Iowa Code § 554.2401(2); *see Estate of Schomer v. Piggot*, 439 N.W.2d 190, 192 (Iowa 1989) (quoting subsection 554.2401(2) and holding that title passed upon delivery). The UCC provision is identical. U.C.C. § 2-401(2) ("Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods. . . .").

18

never physically appeared in the forum state, the third party had to visit the plaintiff in the forum state to "work[] with [the plaintiff's] employees in assuring the adequacy of the final product," and "to determine the quality of the materials being produced for [the nonresident defendant]." *Id.* at 818, 819 n.1. Moreover, the plaintiff reasonably believed that the third party was the nonresident defendants' agent. *Id.* at 819 n.1. As a result, the Eighth Circuit Court of Appeals ascribed the activities of the third party to the nonresident defendant, thus establishing "slight" physical contact between the nonresident defendant and the forum state. *Id.* at 819 n.1, 820. In so holding, the court recognized the United States Supreme Court's holding "that 'when commercial activities are carried on in behalf of an out-of-state party those activities may sometimes be ascribed to the party, at least where [it] is a primary participant in the enterprise and has acted purposefully in directing those activities.'" *Id.* at 819 n.1 (quoting *Burger King Corp.*, 471 U.S. at 479 n.22).

In this case, Wells Dairy obviously had a reasonable belief that FMI was picking up its purchased product at Wells Dairy's plant in Le Mars. Moreover, FMI specifically requested that it receive "customer pick-up" to save money on transportation costs. Thus, FMI "acted purposely in directing those activities"—i.e., the "commercial activities" of accepting delivery of FMI's purchased product. *Burger King Corp.*, 471 U.S. at 479 n.22. As a result, the court believes FMI has "slight" physical contacts in Iowa, *see Bell Paper I*, 22 F.3d at 820, even if the company and its employees never presented themselves in the forum state.

So far, the court has only discussed the nature, quality, and quantity of FMI's contacts with Iowa, and also the relation of the cause of action to those contacts. The court believes these considerations favor a finding of sufficient minimum contacts. The last two factors are a wash: Iowa definitely has a strong interest in providing a forum for one of its most well-known companies, but holding court in Iowa is likely more inconvenient for

FMI than would be the inconvenience to Wells Dairy of holding court in, say, California. But the last two factors are only of secondary importance, and the court believes the first three primary factors support a showing of minimum contacts—either for specific or general personal jurisdiction.

### 2. *Fair play and substantial justice*

In a case like this, where the minimum contacts are at least questionable concerning physical contacts, it is prudent to analyze whether exercising personal jurisdiction over a nonresident defendant would "offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316; *see Burger King Corp.*, 471 U.S. at 477 ("These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."). The parties did not specifically address the many factors a court may look at when addressing whether the exercise of personal jurisdiction is reasonable and fair. *See Burger King*, 471 U.S. at 476-77 (listing the factors). In the court's consideration of the factors, the court is not aware of any that preclude a finding of personal jurisdiction over FMI. FMI, in fact, has not asserted any reason why it would suffer an unreasonable burden in defending this lawsuit in Iowa. As a result, and particularly because FMI is the party that initiated this business relationship knowing full well the product would be manufactured, delivered, and resold in Iowa, the court finds exercising personal jurisdiction over the defendant is fair and justified.

### V. CONCLUSION

The court finds sufficient minimum contacts exist between FMI and Iowa as a result of the combination of the three types of contacts present in this case: communicative, legal, and physical. In addition, the court finds the exercise of personal jurisdiction would

not offend traditional notions of fair play and substantial justice. Therefore, the court has personal jurisdiction over FMI, and the court **denies** FMI's motion to dismiss this lawsuit under Rule 12(b)(2) for lack of personal jurisdiction. Dkt. # 4.

      **IT IS SO ORDERED.**

      **DATED** this 8th day of July, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA